# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| KEELEY BOGART and JULIE SCHAUS, on behalf of themselves individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>NAVVIS & COMPANY, LLC,<br><br>Defendant. | Case No.: _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY DEMAND** |

Plaintiffs Keeley Bogart and Julie Schaus ("Plaintiffs") bring this Class Action Complaint ("Complaint") against Defendant Navvis & Company, LLC ("Navvis" or "Defendant") as individuals and on behalf of all others similarly situated, and allege, upon personal knowledge as to their own actions and their counsels' investigation, and upon information and belief as to all other matters, as follows:

## NATURE OF THE ACTION

1.      This class action arises out of the recent cyberattack and data breach ("Data Breach") resulting from Defendant's failure to implement reasonable and industry standard data security practices.

2.      Defendant is a healthcare company that provides products and services to "health plans, health systems, and physician enterprises[.]"[1]

3.      Plaintiffs bring this Complaint against Defendant for its failure to properly secure and safeguard the sensitive information that it collected and maintained as part of their regular

---

[1] https://www.navvishealthcare.com/about-navvis/

business practices, including, but not limited to names, dates of birth, Social Security numbers ("personally identifying information" or "PII") and medical treatment and health insurance information, which is protected health information ("PHI", and collectively with PII, "Private Information") as defined by the Health Insurance Portability and Accountability Act of 1996 ("HIPAA").

4.      Upon information and belief, former and current plan members and/or patients at Navvis's clients are required to entrust Defendant with sensitive, non-public Private Information, without which Defendant could not perform its regular business activities, in order to become plan members and/or patients at Defendant's clients. Defendant retains this information for at least many years and even after the relationship has ended.

5.      By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties to those individuals to protect and safeguard that information from unauthorized access and intrusion.

6.      According to the Notice of Security Incident letter that Defendant sent to Plaintiffs and other impacted Class Members (the "Notice Letter"), on or around July 25, 2023, Navvis "identified suspicious activity within [its] computer network environment."[2] Subsequently, Defendant "launched an investigation to determine the nature and scope of the activity."[3] As a result of the investigation, Defendant concluded that "between July 12, 2023, and July 25, 2023, an unauthorized actor may had had access to certain systems."[4]

7.      Defendant failed to adequately protect Plaintiffs' and Class Members' Private Information—and failed to even encrypt or redact this highly sensitive information. This

---

[2] The "Notice Letter".
[3] *Id.*
[4] *Id.*

unencrypted, unredacted Private Information was compromised due to Defendant's negligent and/or careless acts and omissions and its utter failure to protect its clients' plan members' and patients' sensitive data. Hackers targeted and obtained Plaintiffs' and Class Members' Private Information because of its value in exploiting and stealing the identities of Plaintiffs and Class Members. The present and continuing risk to victims of the Data Breach will remain for their respective lifetimes.

8.      In breaching its duties to properly safeguard its clients' plan members and patients Private Information and give plan members timely, adequate notice of the Data Breach's occurrence, Defendant's conduct amounts to negligence and/or recklessness and violates federal and state statutes.

9.      Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; and (iii) effectively secure hardware containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts at least to negligence and violates federal and state statutes.

10.     Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiffs and Class Members

was compromised through disclosure to an unknown and unauthorized third party. Plaintiffs and Class Members have a continuing interest in ensuring that their information is and remains safe, and they should be entitled to injunctive and other equitable relief.

11.     Plaintiffs and Class Members have suffered injuries as a result of Defendant's conduct. These injuries include: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) Plaintiff Schaus's Private Information being disseminated on the dark web, according to Experian and McAfee; (ix) statutory damages; (x) nominal damages; and (xi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

12.     Plaintiffs seek to remedy these harms and prevent any future data compromise on behalf of themselves and all similarly situated persons whose personal data was compromised and stolen as a result of the Data Breach and who remain at risk due to Defendant's inadequate data security practices.

## **PARTIES**

13.     Plaintiff Keeley Bogart is and has been, at all relevant times, a resident and citizen of Alton, Illinois.

14.    Plaintiff Julie Schaus is and has been, at all relevant times, a resident and citizen of Madison, Wisconsin.

15.    Defendant Navvis & Company, LLC is a limited liability company organized under the state laws of Delaware, with its principal place of business located in St. Louis, Missouri.

## JURISDICTION AND VENUE

16.    This Court has subject matter jurisdiction over this action under 28 U.S.C.§ 1332(d) because this is a class action wherein the amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, there are more than 100 members in the proposed class, and at least one member of the class, including Plaintiffs, is a citizen of a state different from Defendant.

17.    This Court has personal jurisdiction over Defendant because Defendant regularly conducts business in Illinois, and has sufficient minimum contacts in Illinois.

18.    Venue is proper under 18 U.S.C § 1391(b)(1) because a substantial part of the events, acts, and omissions giving rise to Plaintiffs' claims occurred in this District.

## .STATEMENT OF FACTS

### *Defendant's Business*

19.    Defendant is a healthcare company that provides products and services to "health plans, health systems, and physician enterprises[.]"[5]

20.    In order to become a plan member and/or patient at Defendant's clients, Defendant requires its clients' plan members and patients to provide sensitive and confidential Private Information, including their names, dates of birth, Social Security numbers, and other sensitive information.

---

[5] https://www.navvishealthcare.com/about-navvis/

21.    The information held by Defendant in its computer systems included the unencrypted Private Information of Plaintiffs and Class Members.

22.    Upon information and belief, Defendant made promises and representations to its clients' plan members and patients that the Private Information collected from them as a condition of becoming plan members and/or patients at Defendant's clients would be kept safe, confidential, that the privacy of that information would be maintained, and that Defendant would delete any sensitive information after they were no longer required to maintain it.

23.    Plaintiffs and Class Members provided their Private Information to Defendant with the reasonable expectation and mutual understanding that Defendant would comply with its obligations to keep such information confidential and secure from unauthorized access.

24.    Plaintiffs and the Class Members have taken reasonable steps to maintain the confidentiality of their Private Information. Plaintiffs and Class Members relied on the sophistication of Defendant to keep their Private Information confidential and securely maintained, to use this information for necessary purposes only, and to make only authorized disclosures of this information. Plaintiffs and Class Members value the confidentiality of their Private Information and demand security to safeguard their Private Information.

25.    Defendant had a duty to adopt reasonable measures to protect the Private Information of Plaintiffs and Class Members from involuntary disclosure to third parties. Defendant has a legal duty to keep its clients' patients' and plan members' Private Information safe and confidential.

26.    Defendant had obligations created by the FTC Act, HIPAA, contract, and industry standards, to keep its clients' plan members' and patients' Private Information confidential and to protect it from unauthorized access and disclosure.

27.     Defendant derived a substantial economic benefit from collecting Plaintiffs' and Class Members' Private Information. Without the required submission of Private Information, Defendant could not perform the services it provides.

28.     By obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties and knew or should have known that it was responsible for protecting Plaintiffs' and Class Members' Private Information from disclosure.

***The Data Breach***

29.     In or about December 2023, Defendant published a notice to its website, informing Plaintiffs and Class Members, in relevant part, that:

> On July 25, 2023, Navvis & Company, LLC ("Navvis") became aware of suspicious activity on its computer network. Navvis immediately launched an investigation, to determine the nature and scope of the incident. Through its investigation, Navvis determined that, between July 12, 2023 – July 25, 2023, it was a victim of a cyber-attack, and a threat actor had access to certain systems that stored personal and protected health information. Navvis conducted a thorough forensics review of the systems and files to confirm what information was stored therein, and to whom the information related. On or about July 25, 2023, this extensive review identified certain individuals' information was present within the accessed records.
>
> . . .
>
> The types of information impacted related to individuals include: an individual's name, date of birth, Medicaid/Medicare ID number, health plan information, medical treatment information, medical record number, patient account number, case identification number, provider and doctor information and health record information, and in some circumstances, Social Security number.[6]

30.     Omitted from the online notice were the details of the root cause of the Data Breach, the vulnerabilities exploited, and the remedial measures undertaken to ensure such a breach does not occur again. To date, these critical facts have not been explained or clarified to Plaintiffs and

---

[6] https://navvishealthcare.com/privacy-update

Class Members, who retain a vested interest in ensuring that their Private Information remains protected.

31.    This "disclosure" amounts to no real disclosure at all, as it fails to inform, with any degree of specificity, Plaintiffs and Class Members of the Data Breach's critical facts. Without these details, Plaintiffs' and Class Members' ability to mitigate the harms resulting from the Data Breach is severely diminished.

32.    Defendant did not use reasonable security procedures and practices appropriate to the nature of the sensitive information they were maintaining for Plaintiffs and Class Members, causing the exposure of Private Information, such as encrypting the information or deleting it when it is no longer needed.

33.    The attacker accessed and acquired files in Defendant's computer systems containing unencrypted Private Information of Plaintiffs and Class Members, including their names, Social Security numbers, PHI, and other sensitive information. Plaintiffs' and Class Members' Private Information was accessed and stolen in the Data Breach.

34.    Plaintiff Schaus has been informed by Experian that her Private Information has been disseminated on the dark web, and Plaintiffs further believe that Plaintiff Bogart's Private Information and that of Class Members was or will be sold on the dark web, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

### Data Breaches Are Preventable

35.    As explained by the Federal Bureau of Investigation, "[p]revention is the most effective defense against ransomware and it is critical to take precautions for protection."[7]

---

[7] *See* How to Protect Your Networks from RANSOMWARE, at 3, available at https://www.fbi.gov/file-repository/ransomware-prevention-and-response-for-cisos.pdf/view

36.    To prevent and detect cyber-attacks and/or ransomware attacks Defendant could and should have implemented, as recommended by the United States Government, the following measures:

- Implement an awareness and training program. Because end users are targets, employees and individuals should be aware of the threat of ransomware and how it is delivered.

- Enable strong spam filters to prevent phishing emails from reaching the end users and authenticate inbound email using technologies like Sender Policy Framework (SPF), Domain Message Authentication Reporting and Conformance (DMARC), and DomainKeys Identified Mail (DKIM) to prevent email spoofing.

- Scan all incoming and outgoing emails to detect threats and filter executable files from reaching end users.

- Configure firewalls to block access to known malicious IP addresses.

- Patch operating systems, software, and firmware on devices. Consider using a centralized patch management system.

- Set anti-virus and anti-malware programs to conduct regular scans automatically.

- Manage the use of privileged accounts based on the principle of least privilege: no users should be assigned administrative access unless absolutely needed; and those with a need for administrator accounts should only use them when necessary.

- Configure access controls—including file, directory, and network share permissions—with least privilege in mind. If a user only needs to read specific files, the user should not have write access to those files, directories, or shares.

- Disable macro scripts from office files transmitted via email. Consider using Office Viewer software to open Microsoft Office files transmitted via email instead of full office suite applications.

- Implement Software Restriction Policies (SRP) or other controls to prevent programs from executing from common ransomware locations, such as temporary folders supporting popular Internet browsers or compression/decompression programs, including the AppData/LocalAppData folder.

- Consider disabling Remote Desktop protocol (RDP) if it is not being used.

- Use application whitelisting, which only allows systems to execute programs known and permitted by security policy.

- Execute operating system environments or specific programs in a virtualized environment.

- Categorize data based on organizational value and implement physical and logical separation of networks and data for different organizational units.[8]

37.    To prevent and detect cyber-attacks or ransomware attacks Defendant could and should have implemented, as recommended by the Microsoft Threat Protection Intelligence Team, the following measures:

**Secure internet-facing assets**

- Apply latest security updates
- Use threat and vulnerability management
- Perform regular audit; remove privileged credentials;

**Thoroughly investigate and remediate alerts**

- Prioritize and treat commodity malware infections as potential full compromise;

**Include IT Pros in security discussions**

- Ensure collaboration among [security operations], [security admins], and [information technology] admins to configure servers and other endpoints securely;

**Build credential hygiene**

- Use [multifactor authentication] or [network level authentication] and use strong, randomized, just-in-time local admin passwords;

**Apply principle of least-privilege**

- Monitor for adversarial activities
- Hunt for brute force attempts
- Monitor for cleanup of Event Logs
- Analyze logon events;

---

[8] *Id.* at 3-4.

**Harden infrastructure**

-     Use Windows Defender Firewall
-     Enable tamper protection
-     Enable cloud-delivered protection
-     Turn on attack surface reduction rules and [Antimalware Scan Interface] for Office [Visual Basic for Applications].[9]

38.    Given that Defendant was storing the sensitive Private Information of its clients' plan members and patients, Defendant could and should have implemented all of the above measures to prevent and detect cyberattacks.

39.    The occurrence of the Data Breach indicates that Defendant failed to adequately implement one or more of the above measures to prevent cyberattacks, resulting in the Data Breach and the exposure of the Private Information of, upon information and belief, thousands of individuals, including that of Plaintiffs and Class Members.

***Defendant Acquires, Collects, and Stores Plaintiffs' and the Class's Private Information***

40.    As a condition to become a plan member and/or patient at Defendant's clients, Defendant requires its clients' plan members and patients to give their sensitive and confidential Private Information to Defendant.

41.    Defendant retains and stores this information and derive a substantial economic benefit from the Private Information that it collects. But for the collection of Plaintiffs' and Class Members' Private Information, Defendant would be unable to perform its services.

42.    By obtaining, collecting, and storing the Private Information of Plaintiffs and Class Members, Defendant assumed legal and equitable duties and knew or should have known that they were responsible for protecting the Private Information from disclosure.

---

[9] *See* Human-operated ransomware attacks: A preventable disaster (Mar 5, 2020), *available at:* https://www.microsoft.com/security/blog/2020/03/05/human-operated-ransomware-attacks-a-preventable-disaster/

43.    Plaintiffs and Class Members have taken reasonable steps to maintain the confidentiality of their Private Information and relied on Defendant to keep their Private Information confidential and maintained securely, to use this information for business purposes only, and to make only authorized disclosures of this information.

44.    Defendant could have prevented this Data Breach by properly securing and encrypting the files and file servers containing the Private Information of Plaintiffs and Class Members.

45.    Upon information and belief, Defendant made promises to its clients' plan members and patients to maintain and protect their Private Information, demonstrating an understanding of the importance of securing Private Information.

46.    Defendant's negligence in safeguarding the Private Information of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

### *Defendant Knew, Or Should Have Known, Of The Risk Because Healthcare Entities In Possession Of Private Information Are Particularly Susceptible To Cyber Attacks*

47.    Data thieves regularly target companies like Defendant's due to the highly sensitive information that they custody. Defendant knew and understood that unprotected Private Information is valuable and highly sought after by criminal parties who seek to illegally monetize that Private Information through unauthorized access.

48.    Defendant's data security obligations were particularly important given the substantial increase in cyber-attacks and/or data breaches targeting healthcare entities that collect and store Private Information and other sensitive information, like Defendant, preceding the date of the breach.

49.    In the third quarter of the 2023 fiscal year alone, 7333 organizations experienced data breaches, resulting in 66,658,764 individuals' personal information being compromised.[10]

50.    In light of recent high profile cybersecurity incidents at other healthcare partner and provider companies, including American Medical Collection Agency (25 million patients, March 2019), University of Washington Medicine (974,000 patients, December 2018), Florida Orthopedic Institute (640,000 patients, July 2020), Wolverine Solutions Group (600,000 patients, September 2018), Oregon Department of Human Services (645,000 patients, March 2019), Elite Emergency Physicians (550,000 patients, June 2020), Magellan Health (365,000 patients, April 2020), and BJC Health System (286,876 patients, March 2020), Defendant knew or should have known that their electronic records would be targeted by cybercriminals.

51.    Indeed, cyber-attacks, such as the one experienced by Defendant, have become so notorious that the Federal Bureau of Investigation ("FBI") and U.S. Secret Service have issued a warning to potential targets so they are aware of, and prepared for, a potential attack. As one report explained, smaller entities that store Private Information are "attractive to ransomware criminals…because they often have lesser IT defenses and a high incentive to regain access to their data quickly."[11]

52.    Additionally, as companies became more dependent on computer systems to run their business,[12] *e.g.*, working remotely as a result of the Covid-19 pandemic, and the Internet of

---

[10] *See* https://www.idtheftcenter.org/publication/q3-data-breach-2023-analysis/

[11] https://www.law360.com/consumerprotection/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware?nl_pk=3ed44a08-fcc2-4b6c-89f0-aa0155a8bb51&utm_source=newsletter&utm_medium=email&utm_campaign=consumerprotection

[12] https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html

Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[13]

53.    Despite the prevalence of public announcements of data breach and data security compromises, Defendant failed to take appropriate steps to protect the Private Information of Plaintiffs and Class Members from being compromised.

54.    As a custodian of Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class members, and of the foreseeable consequences if its data security systems were breached, including the significant costs imposed on Plaintiffs and Class Members as a result of a breach.

55.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members and of the foreseeable consequences that would occur if Defendant's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

56.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant's server(s), amounting to, upon information and belief, thousands of individuals' detailed, Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

57.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

---

[13]    https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022

58.     In the Notice Letter, Defendant offers to provide 12 months of credit and theft monitoring services for Plaintiffs and Class Members. This is wholly inadequate to compensate Plaintiffs and Class Members as it fails to provide for the fact victims of data breaches and other unauthorized disclosures commonly face multiple years of ongoing identity theft, financial fraud, and it entirely fails to provide sufficient compensation for the unauthorized release and disclosure of Plaintiffs' and Class Members' Private Information. Moreover, once this service expires, Plaintiffs and Class Members will be forced to pay out of pocket for necessary identity monitoring services.

59.     Defendant's offer of credit and identity monitoring establishes that Plaintiffs' and Class Members' sensitive Private Information was in fact affected, accessed, compromised, and exfiltrated from Defendant's computer systems.

60.     The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen—particularly Social Security numbers and PHI—fraudulent use of that information and damage to victims may continue for years.

61.     As a healthcare entity in possession of its clients' plan members' and patients' Private Information, Defendant knew, or should have known, the importance of safeguarding the Private Information entrusted to it by Plaintiffs and Class Members and of the foreseeable consequences if its data security systems were breached. This includes the significant costs imposed on Plaintiffs and Class Members as a result of a breach. Nevertheless, Defendant failed to take adequate cybersecurity measures to prevent the Data Breach.

### *Value of Private Information*

62.    The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[14] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[15]

63.    The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials.[16]

64.    For example, Personal Information can be sold at a price ranging from $40 to $200.[17] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[18]

65.    Social Security numbers, which were compromised for some of the Class Members as alleged herein, for example, are among the worst kind of PII to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social

---

[14] 17 C.F.R. § 248.201 (2013).
[15] *Id.*
[16] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019, *available at*: https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/
[17] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017, *available at*: https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/
[18] *In the Dark*, VPNOverview, 2019, *available at*: https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/

Security Administration stresses that the loss of an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.

66.     What's more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

67.     Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "[t]he credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."

68.     Theft of PHI is also gravely serious: "[a] thief may use your name or health insurance numbers to see a doctor, get prescription drugs, file claims with your insurance provider, or get other care. If the thief's health information is mixed with yours, your treatment, insurance and payment records, and credit report may be affected."[19]

69.     The greater efficiency of electronic health records brings the risk of privacy breaches. These electronic health records contain a lot of sensitive information (*e.g.,* patient data,

---

[19]     *Medical          I.D.          Theft*,          EFraudPrevention
https://efraudprevention.net/home/education/?a=187#:~:text=A%20thief%20may%20use%20yo
ur,credit%20report%20may%20be%20affected.

patient diagnosis, lab results, medications, prescriptions, treatment plans, etc.) that is valuable to cybercriminals. One patient's complete record can be sold for hundreds of dollars on the dark web. As such, Private Information is a valuable commodity for which a "cyber black market" exists where criminals openly post stolen payment card numbers, Social Security numbers, and other personal information on several underground internet websites. Unsurprisingly, the pharmaceutical industry is at high risk and is acutely affected by cyberattacks, like the Data Breach here.

70.    Between 2005 and 2019, at least 249 million people were affected by healthcare data breaches.[20] Indeed, during 2019 alone, over 41 million healthcare records were exposed, stolen, or unlawfully disclosed in 505 data breaches.[21] In short, these sorts of data breaches are increasingly common, especially among healthcare systems, which account for 30.03 percent of overall health data breaches, according to cybersecurity firm Tenable.[22]

71.    According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[23]

72.    "Medical identity theft is a growing and dangerous crime that leaves its victims with little to no recourse for recovery," reported Pam Dixon, executive director of World Privacy Forum. "Victims often experience financial repercussions and worse yet, they frequently discover erroneous information has been added to their personal medical files due to the thief's activities."[24]

---

[20] https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7349636/#B5-healthcare-08-00133/

[21] https://www.hipaajournal.com/december-2019-healthcare-data-breach-report/

[22]    https://www.tenable.com/blog/healthcare-security-ransomware-plays-a-prominent-role-incovid-19-era-breaches/

[23] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content

[24] Michael Ollove, "The Rise of Medical Identity Theft in Healthcare," Kaiser Health News, Feb. 7, 2014, https://khn.org/news/rise-of-indentity-theft/

73.    A study by Experian found that the average cost of medical identity theft is "about $20,000" per incident and that most victims of medical identity theft were forced to pay out-of-pocket costs for healthcare they did not receive to restore coverage.[25] Almost half of medical identity theft victims lose their healthcare coverage as a result of the incident, while nearly one-third of medical identity theft victims saw their insurance premiums rise, and 40 percent were never able to resolve their identity theft at all.[26]

74.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change—names, dates of birth, Social Security numbers, and PHI.

75.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information . . . [is] worth more than 10x on the black market."[27]

76.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

77.    The fraudulent activity resulting from the Data Breach may not come to light for years. There may be a time lag between when harm occurs versus when it is discovered, and also

---

[25] *See* Elinor Mills, "Study: Medical Identity Theft is Costly for Victims," CNET (Mar, 3, 2010), https://www.cnet.com/news/study-medical-identity-theft-is-costly-for-victims/

[26] *Id.; see also Healthcare Data Breach: What to Know About them and What to Do After One,* EXPERIAN,            https://www.experian.com/blogs/ask-experian/healthcare-data-breach-what-toknow-about-them-and-what-to-do-after-one/

[27] Tim Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), *available at*: https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html

between when Private Information is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[28]

78.     Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information.

***Defendant Fails To Comply With FTC Guidelines***

79.     The Federal Trade Commission ("FTC") has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

80.     In 2016, the FTC updated its publication, Protecting Personal Information: A Guide for Business, which established cyber-security guidelines for businesses. These guidelines note that businesses should protect the personal plan member information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.[29]

---

[28] *Report to Congressional Requesters*, GAO, at 29 (June 2007), *available at:* https://www.gao.gov/assets/gao-07-737.pdf

[29] *Protecting Personal Information: A Guide for Business*, Federal Trade Commission (2016). Available at https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting-personal-information.pdf

81.     The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.[30]

82.     The FTC further recommends that companies not maintain Private Information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

83.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect plan member data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential patient data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

84.     These FTC enforcement actions include actions against healthcare entities, like Defendant. *See, e.g., In the Matter of LabMD, Inc., a corp*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

85.     Section 5 of the FTC Act, 15 U.S.C. § 45, prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair act or practice

---

[30] *Id.*

by businesses, such as Defendant, of failing to use reasonable measures to protect Private Information. The FTC publications and orders described above also form part of the basis of Defendant's duty in this regard.

86.    Defendant failed to properly implement basic data security practices.

87.    Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to its clients' plan members Private Information or to comply with applicable industry standards constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

88.    Upon information and belief, Defendant was at all times fully aware of its obligations to protect the Private Information of its clients' plan members. Defendant was also aware of the significant repercussions that would result from its failure to do so. Accordingly, Defendant's conduct was particularly unreasonable given the nature and amount of Private Information they obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

### Defendant Fails To Comply With HIPAA Guidelines

89.    Defendant is a covered business associate under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

90.    Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[31] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

91.    HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

92.    HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

93.    HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

94.    "Electronic protected health information" is "individually identifiable health information … that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

95.    HIPAA's Security Rule requires Defendant to do the following:

    a.    Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entity or business associate creates, receives, maintains, or transmits;

    b.    Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

---

[31] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

      c.      Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

      d.      Ensure compliance by its workforce.

96.     HIPAA also requires Defendant to "review and modify the security measures implemented … as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e). Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

97.     HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

98.     The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "without unreasonable delay and ***in no case later than 60 days following discovery of the breach***."[32]

99.     HIPAA requires a covered business associate to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and

---

[32]   Breach Notification Rule, U.S. Dep't of Health & Human Services, https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (emphasis added).

procedures of the covered business associate or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

100.    HIPAA requires a covered business associate to mitigate, to the extent practicable, any harmful effect that is known to the covered business associate of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

101.    HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." US Department of Health & Human Services, Security Rule Guidance Material.[33] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says "represent the industry standard for good business practices with respect to standards for securing e-PHI." US Department of Health & Human Services, Guidance on Risk Analysis.[34]

---

[33] http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html.
[34]                    https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html

*Defendant Fails To Comply With Industry Standards*

102.    As noted above, experts studying cyber security routinely identify healthcare entities in possession of Private Information as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

103.    Several best practices have been identified that, at a minimum, should be implemented by healthcare entities in possession of Private Information, like Defendant, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data and limiting which employees can access sensitive data. Defendant failed to follow these industry best practices, including a failure to implement multi-factor authentication.

104.    Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points. Defendant failed to follow these cybersecurity best practices, including failure to train staff.

105.    Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

106.    These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and upon information and belief, Defendant failed to comply with at least one––or all––of these accepted standards, thereby opening the door to the threat actor and causing the Data Breach.

## COMMON INJURIES & DAMAGES

107.    As a result of Defendant's ineffective and inadequate data security practices, the Data Breach, and the foreseeable consequences of Private Information ending up in the possession of criminals, the risk of identity theft to the Plaintiffs and Class Members has materialized and is imminent, and Plaintiffs and Class Members have all sustained actual injuries and damages, including: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

### *The Data Breach Increases Plaintiffs' & Class Members' Risk Of Identity Theft*

108.    As Plaintiff Schaus has already experienced, the unencrypted Private Information of Class Members will end up for sale on the dark web as that is the *modus operandi* of hackers.

109.    Unencrypted Private Information may also fall into the hands of companies that will use the detailed Private Information for targeted marketing without the approval of Plaintiffs

and Class Members. Simply, unauthorized individuals can easily access the Private Information of Plaintiffs and Class Members.

110.    The link between a data breach and the risk of identity theft is simple and well established. Criminals acquire and steal Private Information to monetize the information. Criminals monetize the data by selling the stolen information on the black market to other criminals who then utilize the information to commit a variety of identity theft related crimes discussed below.

111.    Plaintiffs' and Class Members' Private Information is of great value to hackers and cyber criminals, and the data stolen in the Data Breach has been used and will continue to be used in a variety of sordid ways for criminals to exploit Plaintiffs and Class Members and to profit off their misfortune.

112.    One such example of criminals piecing together bits and pieces of compromised PII for profit is the development of "Fullz" packages.[35]

113.    With "Fullz" packages, cyber-criminals can cross-reference two sources of Private Information to marry unregulated data available elsewhere to criminally stolen data with an

---

[35] "Fullz" is fraudster speak for data that includes the information of the victim, including, but not limited to, the name, address, credit card information, social security number, date of birth, and more. As a rule of thumb, the more information you have on a victim, the more money that can be made off of those credentials. Fullz are usually pricier than standard credit card credentials, commanding up to $100 per record (or more) on the dark web. Fullz can be cashed out (turning credentials into money) in various ways, including performing bank transactions over the phone with the required authentication details in-hand. Even "dead Fullz," which are Fullz credentials associated with credit cards that are no longer valid, can still be used for numerous purposes, including tax refund scams, ordering credit cards on behalf of the victim, or opening a "mule account" (an account that will accept a fraudulent money transfer from a compromised account) without the victim's knowledge. *See*, *e.g.*, Brian Krebs, *Medical Records for Sale in Underground Stolen From Texas Life Insurance Firm*, Krebs on Security (Sep. 18, 2014), https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-](https://krebsonsecuritv.com/2014/09/medical-records-for-sale-in-underground-stolen-from-texas-life-insurance-finn/

astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals.

114.    The development of "Fullz" packages means here that the stolen Private Information from the Data Breach can easily be used to link and identify it to Plaintiffs' and Class Members' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the Private Information that was exfiltrated in the Data Breach, criminals may still easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over.

115.    The existence and prevalence of "Fullz" packages means that the Private Information stolen from the data breach can easily be linked to the unregulated data (like phone numbers and emails) of Plaintiffs and the other Class Members.

116.    Thus, even if certain information (such as driver's license numbers) was not stolen in the data breach, criminals can still easily create a comprehensive "Fullz" package.

117.    Then, this comprehensive dossier can be sold—and then resold in perpetuity—to crooked operators and other criminals (like illegal and scam telemarketers).

***Loss Of Time To Mitigate The Risk Of Identity Theft And Fraud***

118.    As a result of the recognized risk of identity theft, when a Data Breach occurs, and an individual is notified by a company that their Private Information was compromised, as in this Data Breach, the reasonable person is expected to take steps and spend time to address the dangerous situation, learn about the breach, and otherwise mitigate the risk of becoming a victim of identity theft of fraud. Failure to spend time taking steps to review accounts or credit reports

could expose the individual to greater financial harm – yet, the resource and asset of time has been lost.

119.    Thus, due to the actual and imminent risk of identity theft, in its Notice Letter, Defendant instructs Plaintiffs and Class Members to take the following measures to protect themselves: to enroll in credit monitoring services in order "[w]e encourage you to remain vigilant against incidents of identity theft and fraud, and to review your account statements and credit reports for suspicious activity or errors."[36]

120.    Plaintiffs and Class Members have spent, and will spend additional time in the future, on a variety of prudent actions, such as researching the Data Breach to verify the incident and obtain more details on its occurrence, contacting McAfee to ensure their accounts are secure, placing credit freezes and placing holds on their accounts through credit bureaus, and placing filters on their email in response to an increase in spam emails.

121.    Plaintiffs' mitigation efforts are consistent with the U.S. Government Accountability Office that released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[37]

122.    Plaintiffs' mitigation efforts are also consistent with the steps that FTC recommends that data breach victims take several steps to protect their personal and financial information after a data breach, including: contacting one of the credit bureaus to place a fraud alert (consider an extended fraud alert that lasts for seven years if someone steals their identity),

---

[36] Notice Letter.

[37] *See* United States Government Accountability Office, GAO-07-737, Personal Information: Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown (June 2007), https://www.gao.gov/new.items/d07737.pdf.

reviewing their credit reports, contacting companies to remove fraudulent charges from their accounts, placing a credit freeze on their credit, and correcting their credit reports.[38]

123.    And for those Class Members who experience actual identity theft and fraud, the United States Government Accountability Office released a report in 2007 regarding data breaches ("GAO Report") in which it noted that victims of identity theft will face "substantial costs and time to repair the damage to their good name and credit record."[4]

### *Diminution Of Value Of PII and PHI*

124.    PII and PHI are valuable property rights.[39] Their value is axiomatic, considering the value of Big Data in corporate America and the consequences of cyber thefts include heavy prison sentences. Even this obvious risk to reward analysis illustrates beyond doubt that Private Information has considerable market value.

125.    Sensitive PII can sell for as much as $363 per record according to the Infosec Institute.[40]

126.    An active and robust legitimate marketplace for PII also exists. In 2019, the data brokering industry was worth roughly $200 billion.[41]

127.    In fact, the data marketplace is so sophisticated that consumers can actually sell their non-public information directly to a data broker who in turn aggregates the information and

---

[38] *See* Federal Trade Commission, *Identity Theft.gov*, https://www.identitytheft.gov/Steps

[39] *See* "Data Breaches Are Frequent, but Evidence of Resulting Identity Theft Is Limited; However, the Full Extent Is Unknown," p. 2, U.S. Government Accountability Office, June 2007, https://www.gao.gov/new.items/d07737.pdf ("GAO Report").

[40] *See, e.g.,* John T. Soma, et al, Corporate Privacy Trend: The "Value" of Personally Identifiable Information ("PII") Equals the "Value" of Financial Assets, 15 Rich. J.L. & Tech. 11, at *3-4 (2009) ("Private Information, which companies obtain at little cost, has quantifiable value that is rapidly reaching a level comparable to the value of traditional financial assets.") (citations omitted).

[41] *See* Ashiq Ja, *Hackers Selling Healthcare Data in the Black Market*, InfoSec (July 27, 2015), https://resources.infosecinstitute.com/topic/hackers-selling-healthcare-data-in-the-black-market/

provides it to marketers or app developers.[42,43] Consumers who agree to provide their web browsing history to the Nielsen Corporation can receive up to $50.00 a year.[44]

128.    According to account monitoring company LogDog, medical data sells for $50 and up on the Dark Web.[45]

129.    As a result of the Data Breach, Plaintiffs' and Class Members' Private Information, which has an inherent market value in both legitimate and dark markets, has been damaged and diminished by its compromise and unauthorized release. However, this transfer of value occurred without any consideration paid to Plaintiffs or Class Members for their property, resulting in an economic loss. Moreover, the Private Information is now readily available, and the rarity of the Data has been lost, thereby causing additional loss of value.

130.    At all relevant times, Defendant knew, or reasonably should have known, of the importance of safeguarding the Private Information of Plaintiffs and Class Members, and of the foreseeable consequences that would occur if Defendant's data security systems were breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

131.    The fraudulent activity resulting from the Data Breach may not come to light for years.

---

[42] https://www.latimes.com/business/story/2019-11-05/column-data-brokers
[43] https://datacoup.com/
[44] https://digi.me/what-is-digime/
[45] Lisa Vaas, *Ransomware Attacks Paralyze, and Sometimes Crush, Hospitals*, Naked Security (Oct. 3, 2019), https://nakedsecurity.sophos.com/2019/10/03/ransomware-attacks-paralyze-and-sometimes-crush-hospitals/#content

132.    Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. The Class is incurring and will continue to incur such damages in addition to any fraudulent use of their Private Information .

133.    Defendant was, or should have been, fully aware of the unique type and the significant volume of data on Defendant network, amounting to, upon information and belief, thousands of individuals' detailed personal information and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

134.    The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

### *Future Cost Of Credit And Identity Theft Monitoring Is Reasonable And Necessary*

135.    Given the type of targeted attack in this case, sophisticated criminal activity, the type of Private Information involved, and Plaintiff Schaus's Private Information already being disseminated on the dark web (as discussed below), there is a strong probability that entire batches of stolen information have been placed, or will be placed, on the black market/dark web for sale and purchase by criminals intending to utilize the Private Information for identity theft crimes – *e.g.*, opening bank accounts in the victims' names to make purchases or to launder money; file false tax returns; take out loans or lines of credit; or file false unemployment claims.

136.    Such fraud may go undetected until debt collection calls commence months, or even years, later. An individual may not know that his or her Private Information was used to file for unemployment benefits until law enforcement notifies the individual's employer of the suspected fraud. Fraudulent tax returns are typically discovered only when an individual's authentic tax return is rejected.

137.    Consequently, Plaintiffs and Class Members are at an increased risk of fraud and identity theft for many years into the future.

138.    The retail cost of credit monitoring and identity theft monitoring can cost around $200 a year per Class Member. This is a reasonable and necessary cost to monitor to protect Class Members from the risk of identity theft that arose from Defendant's Data Breach.

### Loss of Benefit of the Bargain

139.    Furthermore, Defendant's poor data security deprived Plaintiffs and Class Members of the benefit of their bargain. When agreeing to become plan members and/or patients at Defendant's clients under certain terms, Plaintiffs and other reasonable consumers understood and expected that Defendant would properly safeguard and protect their Private Information, when in fact, Defendant did not provide the expected data security. Accordingly, Plaintiffs and Class Members received plan memberships and/or medical services of a lesser value than what they reasonably expected to receive under the bargains they struck with Defendant's clients.

### Plaintiff Keeley Bogart's Experience

140.    Plaintiff Bogart is a patient at SSM Health, which, upon information and belief, contracted with Defendant for services.

141.    As a condition of receiving medical services at SSM Health, Plaintiff Bogart was required to provide Defendant with her Private Information, including her name, date of birth, Social Security number, health insurance information, and other sensitive information.

142.    At the time of the Data Breach—July 12, 2023 through July 25, 2023--Defendant retained Plaintiff Bogart's Private Information in their systems.

143.    Plaintiff Bogart is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location.

She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

144.    Plaintiff Bogart received the Notice Letter, by U.S. mail, directly from Defendant, dated December 29, 2023, informing her that her Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including her name, date of birth, diagnosis/clinical information, health insurance policy-related number, medical date of service, medical provider name, medical provider treatment/procedure information, member ID, other patient identifier, patient account number, plan name, and Subscriber ID.

145.    As a result of the Data Breach and at the direction of the Notice Letter, which instructs Plaintiff to enroll in credit monitoring services "remain vigilant against incidents of identity theft and fraud, and to review your account statements and credit reports for suspicious activity or errors[,]"[46] Plaintiff Bogart made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach to verify the incident and obtain more details on its occurrence, contacting Defendant to obtain more details on the Data Breach's occurrence, and monitoring her credit score. Plaintiff has spent significant time remedying the breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

146.    Plaintiff Bogart suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with

---

[46] Notice Letter.

attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

147.    Plaintiff Bogart also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

148.    The Data Breach has caused Plaintiff Bogart to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

149.    As a result of the Data Breach, Plaintiff Bogart anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

150.    As a result of the Data Breach, Plaintiff Bogart is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

151.    Plaintiff Bogart has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

### Plaintiff Julie Schaus's Experience

152.    Plaintiff Schaus is a current plan member of a health plan that, upon information and belief, contracts with Defendant for services.

153.    As a condition of becoming a plan member at Defendant's client, Plaintiff Schaus was required to provide Defendant with her Private Information, including her name, date of birth, Social Security number, health insurance information, and other sensitive information.

154.    At the time of the Data Breach—July 12, 2023 through July 25, 2023--Defendant retained Plaintiff Schaus' Private Information in their systems.

155.    Plaintiff Schaus is very careful about sharing her sensitive Private Information. Plaintiff stores any documents containing her Private Information in a safe and secure location. She has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

156.    Plaintiff Schaus received the Notice Letter, by U.S. mail, directly from Defendant, dated December 29, 2023, informing her that her Private Information was improperly accessed and obtained by unauthorized third parties during the Data Breach, including her name, date of birth, diagnosis/clinical information, health insurance policy-related number, medical date of service, medical provider name, medical provider treatment/procedure information, member ID, other patient identifier, patient account number, plan name, and Subscriber ID.

157.    As a result of the Data Breach and at the direction of the Notice Letter, which instructs Plaintiff to enroll in credit monitoring services "remain vigilant against incidents of identity theft and fraud, and to review your account statements and credit reports for suspicious activity or errors[,]"[47] Plaintiff Schaus made reasonable efforts to mitigate the impact of the Data Breach, including but not limited to: researching the Data Breach to verify the incident and obtain more details on its occurrence, contacting McAfee to ensure her accounts are secure, placing credit freezes and placing holds on her accounts through credit bureaus, and placing filters on her email

---

[47] Notice Letter.

in response to an increase in spam emails. Plaintiff has spent significant time remedying the breach—valuable time Plaintiff otherwise would have spent on other activities, including but not limited to work and/or recreation. This time has been lost forever and cannot be recaptured.

158.    Plaintiff Schaus suffered actual injury from having her Private Information compromised as a result of the Data Breach including, but not limited to: (i) invasion of privacy; (ii) theft of her Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) statutory damages; (viii) nominal damages; and (ix) the continued and certainly increased risk to her Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

159.    Plaintiff Schaus further suffered actual injury in the form of her Private Information being disseminated on the dark web, according to Experian and McAfee, which, upon information and belief, was caused by the Data Breach.

160.    Plaintiff Schaus also suffered actual injury in the form of experiencing an increase in spam calls, texts, and/or emails, which, upon information and belief, was caused by the Data Breach.

161.    The Data Breach has caused Plaintiff Schaus to suffer fear, anxiety, and stress, which has been compounded by the fact that Defendant has still not fully informed her of key details about the Data Breach's occurrence.

162.    As a result of the Data Breach, Plaintiff Schaus anticipates spending considerable time on an ongoing basis to try to mitigate and address harms caused by the Data Breach.

163.    As a result of the Data Breach, Plaintiff Schaus is at a present risk and will continue to be at increased risk of identity theft and fraud for years to come.

164.    Plaintiff Schaus has a continuing interest in ensuring that her Private Information, which, upon information and belief, remains backed up in Defendant's possession, is protected and safeguarded from future breaches.

## CLASS ACTION ALLEGATIONS

165.    Plaintiffs bring this nationwide class action on behalf of themselves and on behalf of all others similarly situated pursuant to Rule 23(b)(2), 23(b)(3), and 23(c)(4) of the Federal Rules of Civil Procedure.

166.    Plaintiffs propose the following Class Definitions, subject to amendment as appropriate:

**Nationwide Class**
All persons in the United States whose Private Information was maintained on Defendant's computer systems that were compromised in the Data Breach announced by Defendant in December 2023 (the "Class").

**Illinois Subclass**
All persons in the state of Illinois whose Private Information was maintained on Defendant's computer systems that were compromised in the Data Breach announced by Defendant in December 2023 (the "Illinois Subclass").

167.    Excluded from the Classes are Defendant's officers and directors, and any entity in which Defendant has a controlling interest; and the affiliates, legal representatives, attorneys, successors, heirs, and assigns of Defendant. Excluded also from the Class are members of the judiciary to whom this case is assigned, their families and members of their staff.

168.    Plaintiffs hereby reserve the right to amend or modify the Class and/or Illinois Subclass definitions with greater specificity or division after having had an opportunity to conduct discovery.

169.    Numerosity. The Members of the Class are so numerous that joinder of all of them is impracticable. Although the precise number of individuals impacted is currently unknown to Plaintiffs and exclusively in the possession of Defendant, upon information and belief, thousands of individuals were impacted in the Data Breach.

170.    Commonality. There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a.    Whether Defendant unlawfully used, maintained, lost, or disclosed Plaintiffs' and Class Members' Private Information;

b.    Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.    Whether Defendant's data security systems prior to and during the Data Breach complied with applicable data security laws and regulations;

d.    Whether Defendant's data security systems prior to and during the Data Breach were consistent with industry standards;

e.    Whether Defendant owed a duty to Class Members to safeguard their Private Information;

f.    Whether Defendant breached its duty to Class Members to safeguard their Private Information;

g.   Whether computer hackers obtained Class Members' Private Information in the Data Breach;

h.   Whether Defendant knew or should have known that its data security systems and monitoring processes were deficient;

i.   Whether Plaintiffs and Class Members suffered legally cognizable damages as a result of Defendant's misconduct;

j.   Whether Defendant's conduct was negligent;

k.   Whether Defendant breached implied contracts for adequate data security with Plaintiffs and Class Members;

l.   Whether Defendant was unjustly enriched by retention of the monetary benefits conferred on it by Plaintiffs and Class Members;

m.   Whether Defendant failed to provide notice of the Data Breach in a timely manner; and,

n.   Whether Plaintiffs and Class Members are entitled to damages, civil penalties, punitive damages, and/or injunctive relief.

171.   <u>Typicality</u>. Plaintiffs' claims are typical of those of other Class Members because Plaintiffs' Private Information, like that of every other Class Member, was compromised in the Data Breach.

172.   <u>Adequacy of Representation</u>. Plaintiffs will fairly and adequately represent and protect the interests of the Members of the Class. Plaintiffs' Counsel are competent and experienced in litigating class actions.

173.   <u>Predominance</u>. Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' Private Information

was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

174.    Superiority. A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendant. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

175.    Class certification is proper because Defendant has acted or has refused to act on grounds generally applicable to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate as to the Class as a whole.

176.    Class certification is proper because Defendant has engaged in a common course of conduct toward Plaintiffs and Class Members, in that all the Plaintiffs' and Class Members' Private Information was stored on the same computer systems and unlawfully accessed in the same way. The common issues arising from Defendant's conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

177.    A class action is superior to other available methods for the fair and efficient adjudication of the controversy.

178.    Class certification is also appropriate because this Court can designate particular claims or issues for class-wide treatment and may designate one or more Subclasses.

179.    Finally, all Members of the proposed Class are readily ascertainable. Defendant has access to Class Members' names and addresses affected by the Data Breach. Class Members have already been preliminarily identified and sent notice letters by Defendant.

### COUNT I
### Negligence
### (On Behalf of Plaintiffs and the Class)

180.    Plaintiffs re-allege and incorporate by reference all preceding allegations, as if fully set forth herein.

181.    Defendant gathered and stored the Private Information of Plaintiffs and Class Members as part of its business of soliciting its clients, which solicitations and services affect commerce.

182.    Plaintiffs and Class Members entrusted Defendant with their Private Information with the understanding that Defendant would safeguard their information.

183.    Defendant had full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and Class Members could and would suffer if the Private Information were wrongfully disclosed.

184.    By assuming the responsibility to collect and store this data, and in fact doing so, and sharing it and using it for commercial gain, Defendant had a duty of care to use reasonable means to secure and safeguard its computer property—and Class Members' Private Information held within it—to prevent disclosure of the information, and to safeguard the

information from theft. Defendant's duty included a responsibility to implement processes by which it could detect a breach of its security systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

185.    Defendant had a duty to employ reasonable security measures under Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect confidential data.

186.    Defendant's duty to use reasonable security measures under HIPAA required Defendant to "reasonably protect" confidential data from "any intentional or unintentional use or disclosure" and to "have in place appropriate administrative, technical, and physical safeguards to protect the privacy of protected health information." 45 C.F.R. § 164.530(c)(l). Some or all of the healthcare and/or medical information at issue in this case constitutes "protected health information" within the meaning of HIPAA.

187.    For instance, HIPAA required Defendant to notify victims of the Breach within 60 days of the discovery of the Data Breach. Defendant did not begin to notify Plaintiffs or Class Members of the Data Breach until December 29, 2023 despite, upon information and belief, Defendant knowing shortly after July 25, 2023 that unauthorized persons had accessed and acquired the private, protected, personal information of Plaintiffs and the Class.

188.    Defendant owed a duty of care to Plaintiffs and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the Private Information.

189.    Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its clients' plan members and patients. That special relationship arose because Plaintiffs and the Class entrusted Defendant with their confidential Private Information, a necessary part of being plan members and/or patients at Defendant's clients.

190.    Defendant's duty to use reasonable care in protecting confidential data arose not only as a result of the statutes and regulations described above, but also because Defendant is bound by industry standards to protect confidential Private Information.

191.    Defendant was subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs or the Class.

192.    Defendant also had a duty to exercise appropriate clearinghouse practices to remove former plan members' and patients' Private Information it was no longer required to retain pursuant to regulations.

193.    Moreover, Defendant had a duty to promptly and adequately notify Plaintiffs and the Class of the Data Breach.

194.    Defendant had and continues to have a duty to adequately disclose that the Private Information of Plaintiffs and the Class within Defendant's possession might have been compromised, how it was compromised, and precisely the types of data that were compromised and when. Such notice was necessary to allow Plaintiffs and the Class to take steps to prevent, mitigate, and repair any identity theft and the fraudulent use of their Private Information by third parties.

195.    Defendant breached its duties, pursuant to the FTC Act, HIPAA, and other applicable standards, and thus were negligent, by failing to use reasonable measures to protect

Class Members' Private Information. The specific negligent acts and omissions committed by Defendant include, but are not limited to, the following:

> a.  Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' Private Information;
>
> b.  Failing to adequately monitor the security of its networks and systems;
>
> c.  Failure to periodically ensure that its email system had plans in place to maintain reasonable data security safeguards;
>
> d.  Allowing unauthorized access to Class Members' Private Information;
>
> e.  Failing to detect in a timely manner that Class Members' Private Information had been compromised;
>
> f.  Failing to remove former plan members' and patients' Private Information it was no longer required to retain pursuant to regulations,
>
> g.  Failing to timely and adequately notify Class Members about the Data Breach's occurrence and scope, so that they could take appropriate steps to mitigate the potential for identity theft and other damages; and
>
> h.  Failing to secure its stand-alone personal computers, such as the reception desk computers, even after discovery of the data breach.

196.  Defendant violated Section 5 of the FTC Act and HIPAA by failing to use reasonable measures to protect Private Information and not complying with applicable industry standards, as described in detail herein. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtained and stored and the foreseeable consequences of the immense damages that would result to Plaintiffs and the Class.

197.    Plaintiffs and the Class are within the class of persons that the FTC Act and HIPAA were intended to protect.

198.    The harm that occurred as a result of the Data Breach is the type of harm the FTC Act and HIPAA were intended to guard against.

199.    Defendant's violation of Section 5 of the FTC Act and HIPAA constitutes negligence.

200.    The FTC has pursued enforcement actions against businesses, which, as a result of their failures to employ reasonable data security measures and avoid unfair and deceptive practices, caused the same harm as that suffered by Plaintiffs and the Class.

201.    A breach of security, unauthorized access, and resulting injury to Plaintiffs and the Class was reasonably foreseeable, particularly in light of Defendant's inadequate security practices.

202.    It was foreseeable that Defendant's failure to use reasonable measures to protect Class Members' Private Information would result in injury to Class Members. Further, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the healthcare industry.

203.    Defendant has full knowledge of the sensitivity of the Private Information and the types of harm that Plaintiffs and the Class could and would suffer if the Private Information were wrongfully disclosed.

204.    Plaintiffs and the Class were the foreseeable and probable victims of any inadequate security practices and procedures. Defendant knew or should have known of the inherent risks in collecting and storing the Private Information of Plaintiffs and the Class, the

critical importance of providing adequate security of that Private Information, and the necessity for encrypting Private Information stored on Defendant's systems.

205.    It was therefore foreseeable that the failure to adequately safeguard Class Members' Private Information would result in one or more types of injuries to Class Members.

206.    Plaintiffs and the Class had no ability to protect their Private Information that was in, and possibly remains in, Defendant's possession.

207.    Defendant was in a position to protect against the harm suffered by Plaintiffs and the Class as a result of the Data Breach.

208.    Defendant's duty extended to protecting Plaintiffs and the Class from the risk of foreseeable criminal conduct of third parties, which has been recognized in situations where the actor's own conduct or misconduct exposes another to the risk or defeats protections put in place to guard against the risk, or where the parties are in a special relationship. *See* Restatement (Second) of Torts § 302B. Numerous courts and legislatures have also recognized the existence of a specific duty to reasonably safeguard personal information.

209.    Defendant has admitted that the Private Information of Plaintiffs and the Class was wrongfully lost and disclosed to unauthorized third persons as a result of the Data Breach.

210.    But for Defendant's wrongful and negligent breach of duties owed to Plaintiffs and the Class, the Private Information of Plaintiffs and the Class would not have been compromised.

211.    There is a close causal connection between Defendant's failure to implement security measures to protect the Private Information of Plaintiffs and the Class and the harm, or risk of imminent harm, suffered by Plaintiffs and the Class. The Private Information of Plaintiffs and the Class was lost and accessed as the proximate result of Defendant's failure to

exercise reasonable care in safeguarding such Private Information by adopting, implementing, and maintaining appropriate security measures.

212.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) Plaintiff Schaus' Private Information being disseminated on the dark web, according to Experian and McAfee; (ix) statutory damages; (x) nominal damages; and (xi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

213.    As a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will continue to suffer other forms of injury and/or harm, including, but not limited to, anxiety, emotional distress, loss of privacy, and other economic and non-economic losses.

214.    Additionally, as a direct and proximate result of Defendant's negligence, Plaintiffs and the Class have suffered and will suffer the continued risks of exposure of their Private Information, which remain in Defendant's possession and is subject to further

unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information in its continued possession.

215.    Plaintiffs and Class Members are entitled to compensatory and consequential damages suffered as a result of the Data Breach.

216.    Defendant's negligent conduct is ongoing, in that it still holds the Private Information of Plaintiffs and Class Members in an unsafe and insecure manner.

217.    Plaintiffs and Class Members are also entitled to injunctive relief requiring Defendant to (i) strengthen its data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) continue to provide adequate credit monitoring to all Class Members.

**<u>COUNT II</u>**
**Breach of Third-Party Beneficiary Contract**
**(On Behalf of Plaintiffs and the Class)**

218.    Plaintiffs re-allege and incorporate by reference all preceding allegations, as if fully set forth herein.

219.    Upon information and belief, Defendant entered into a contract(s) with its clients to provide administrative services, which services included adequate data security practices, procedures, and protocols sufficient to safeguard the Private Information that was to be entrusted to it (i.e., that of Plaintiffs and the Class).

220.    Such contracts were made expressly for the benefit of Plaintiffs and the Class, as it was their Private Information that Defendant agreed to receive and protect through its services. Thus, the benefit of collection and protection of the Private Information belonging to Plaintiffs and the Class was the direct and primary objective of the contracting parties and

Plaintiffs and Class Members were the intended direct and express beneficiaries of such contracts.

221.    Defendant knew that if it were to breach this contract with its clients, Plaintiffs and the Class would be harmed.

222.    Defendant breached its contract with its clients and, as a result, Plaintiffs and Class Members were affected by this Data Breach when Defendant failed to use reasonable data security measures that could have prevented the Data Breach.

223.    As foreseen, Plaintiffs and the Class were harmed by Defendant's failure to use reasonable data security measures to securely store and transfer the files containing their Private Information, including but not limited to, the continuous and substantial risk of harm through the loss of their Private Information.

224.    Accordingly, Plaintiffs and the Class are entitled to damages in an amount to be determined at trial, along with costs and attorneys' fees incurred in this action.

**COUNT III**
**Invasion of Privacy**
**(On Behalf of Plaintiffs and the Class)**

225.    Plaintiffs re-allege and incorporate by reference all preceding allegations, as if fully set forth herein.

226.    The Private Information of Plaintiffs and Class Members consists of private and confidential facts and information that was never intended to be shared beyond private communications.

227.    Plaintiffs and Class Members had a legitimate expectation of privacy regarding their Private Information and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

228.    By collecting and intentionally failing to keep Plaintiffs' and the Class Members' Private Information safe, and by intentionally misusing and/or disclosing said information to unauthorized parties for unauthorized use, Defendant intentionally invaded Plaintiffs' and Class Members' right to seclusion in their private affairs and interfered with their private concerns.

229.    As a result of Defendant's failure to implement reasonable data security safeguards, it was substantially certain that Defendant's conduct would invade Plaintiffs' and Class Members' right to privacy and interfere with their private concerns.

230.    Defendant knew that ordinary persons in Plaintiffs' or Class Members' positions would consider this an invasion of privacy and Defendant's intentional actions highly offensive and objectionable.

231.    Defendant invaded Plaintiffs' and the Class Members' right to privacy and intruded into Plaintiffs' and the Class Members' private affairs by intentionally collecting, misusing, and/or disclosing their Private Information without their informed, voluntary, affirmative, and clear consent.

232.    Defendant intentionally concealed from Plaintiffs and the Class Members an incident that misused and/or disclosed their Private Information without their informed, voluntary, affirmative, and clear consent.

233.    In failing to protect Plaintiffs' and the Class Members' Private Information, and in intentionally misusing and/or disclosing their Private Information, Defendant acted with intentional malice and oppression and in conscious disregard of Plaintiffs' and the Class Members' rights to have such information kept confidential and private.

234.    Plaintiffs and the Class Members sustained damages (as outline above) as a direct and proximate consequence of the invasion of their privacy by intrusion, and therefore seek an award of damages.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Class)**

235.    Plaintiffs re-allege and incorporate by reference all preceding allegations, as if fully set forth herein.

236.    This Count is pleaded in the alternative to the breach of third-party beneficiary contract count above.

237.    Plaintiffs and Class Members conferred a monetary benefit on Defendant. Specifically, they paid Defendant and/or its agents for plan memberships and/or medical services as well as provided Defendant with their Private Information. In exchange, Plaintiffs and Class Members should have received the plan memberships and/or medical services that were the subject of the transaction and should have had their Private Information protected with adequate data security.

238.    Defendant knew that Plaintiffs and Class Members conferred a benefit on it in the form their Private Information and/or payments made to or on their behalf as a necessary part of becoming plan members and/or patients at Defendant's clients. Defendant appreciated and accepted that benefit. Defendant profited from these transactions and used the Private Information of Plaintiffs and Class Members for business purposes.

239.    Upon information and belief, Defendant funds its data security measures entirely from their general revenue, including payments to or on behalf of Plaintiffs and Class Members.

240.   As such, a portion of the payments made for the benefit of or on behalf of Plaintiffs and Class Members is to be used to provide a reasonable level of data security, and the amount of the portion of each payment made that is allocated to data security is known to Defendant.

241.   Defendant, however, failed to secure Plaintiffs' and Class Members' Private Information and, therefore, did not provide adequate data security in return for the benefit Plaintiffs and Class Members provided.

242.   Defendant would not be able to carry out an essential function of their its business activities without the Private Information of Plaintiffs and Class Members and derived revenue by using it for business purposes. Plaintiffs and Class Members expected that Defendant or anyone in Defendant's position would use a portion of that revenue to fund adequate data security practices.

243.   Defendant acquired the Private Information through inequitable means in that it failed to disclose the inadequate security practices previously alleged.

244.   If Plaintiffs and Class Members knew that Defendant had not reasonably secured their Private Information, they would not have allowed their Private Information to be provided to Defendant or become plan members and/or patients at Defendant's clients.

245.   Defendant enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiffs' and Class Members' Personal Information. Instead of providing a reasonable level of security that would have prevented the hacking incident, Defendant instead calculated to increase its own profit at the expense of Plaintiffs and Class Members by utilizing cheaper, ineffective security measures and diverting those funds to its own profit. Plaintiffs and Class Members, on the other hand, suffered as a

direct and proximate result of Defendant's decision to prioritize their own profits over the requisite security and the safety of their Private Information.

246.    Under the principles of equity and good conscience, Defendant should not be permitted to retain the money wrongfully obtained Plaintiffs and Class Members, because Defendant failed to implement appropriate data management and security measures that are mandated by industry standards.

247.    Plaintiffs and Class Members may not have an adequate remedy at law against Defendant, and accordingly, they plead this claim for unjust enrichment in addition to, or in the alternative to, other claims pleaded herein.

248.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will suffer injury, including but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) Plaintiff Schaus' Private Information being disseminated on the dark web, according to Experian and McAfee; (ix) statutory damages; (x) nominal damages; and (xi) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

249.    Plaintiffs and Class Members have no adequate remedy at law.

250.    As a direct and proximate result of Defendant's conduct, Plaintiffs and Class Members have suffered and will continue to suffer other forms of injury and/or harm.

251.    Defendant should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiffs and Class Members, proceeds that they unjustly received from them. In the alternative, Defendant should be compelled to refund the amounts that Plaintiffs and Class Members overpaid for Defendant's services.

**COUNT V**
**Violation Of The Illinois Consumer Fraud Act**
**815 Ill. Comp. Stat. §§ 505/1, *et seq.***
**(On Behalf of Plaintiff Bogart and the Illinois Subclass)**

252.    Plaintiff Bogart ("Plaintiff" for the purposes of this count) re-alleges and incorporates by reference all preceding allegations, as if fully set forth herein, and brings this claim on behalf of herself and the Illinois Subclass (the "Class" for the purposes of this count).

253.    Plaintiff and the Class are "consumers" as that term is defined in 815 ILL. COMP. STAT. § 505/1(e).

254.    Plaintiff, the Class, and Defendant are "persons" as that term is defined in 815 ILL. COMP. STAT. § 505/1(c).

255.    Defendant is engaged in "trade" or "commerce," including the provision of services, as those terms are defined under 815 ILL. COMP. STAT. § 505/1(f).

256.    Defendant engages in the "sale" of "merchandise" (including services) as defined by 815 ILL. COMP. STAT. § 505/1(b) and (d).

257.    Defendant's acts, practices, and omissions were done in the course of Defendant's business of marketing, offering for sale, and selling administrative services in the State of Illinois.

258.    Defendant engaged in deceptive and unfair acts and practices, misrepresentation, and the concealment, suppression, and omission of material facts in connection with the sale and advertisement of "merchandise" (as defined in the Illinois CFA) in violation of the Illinois CFA, including, but not limited to, the following:

a.  failure to maintain adequate computer systems and data security practices to safeguard current and former patients' and plan members' Private Information;

b.  failure to disclose the material fact that its computer systems and data security practices were inadequate to safeguard the personal information it was collecting and maintaining from theft;

c.  failure to disclose in a timely and accurate manner to Plaintiff and the Class Members the material fact of Defendant's data breach;

d.  misrepresenting material facts to Plaintiff and the Class, in connection with the sale of goods and services, by representing that it would maintain adequate data privacy and security practices and procedures to safeguard Plaintiff's and Class members' Private Information from unauthorized disclosure, release, data breaches, and theft;

e.  misrepresenting material facts to the class, in connection with the sale of goods and services, by representing that Defendant did and would comply with the requirements of relevant federal and state laws pertaining to the privacy and security of Plaintiff's and Class members' Private Information, and

f.  failing to take proper action following the Data Breach to enact adequate privacy and security measures and protect Plaintiff's and Class members' Private

Information from further unauthorized disclosure, release, data breaches, and theft.

259.    In addition, Defendant's failure to disclose that its computer systems were not well protected and that Plaintiff's and Class members' sensitive information was vulnerable and susceptible to intrusion and cyberattacks constitutes deceptive and/or unfair acts or practices because Defendant knew such facts would (a) be unknown to and not easily discoverable by Plaintiff and the Class; and (b) defeat Plaintiff's and Class members' ordinary, foreseeable and reasonable expectations concerning the security of their Private Information on Defendant's servers.

260.    Defendant intended that Plaintiff and the Class rely on its deceptive and unfair acts and practices, misrepresentations, and the concealment, suppression, and omission of material facts, in connection with Defendant's offering of goods and services and storing Plaintiff's and Class members' Private Information on its servers, in violation of the Illinois CFA.

261.    Defendant also engaged in unfair acts and practices by failing to maintain the privacy and security of class members' personal information, in violation of duties imposed by and public policies reflected in applicable federal and state laws, resulting in the data breach.

262.    These unfair acts and practices violated duties imposed by laws including Section 5 of the Federal Trade Commission Act (15 U.S.C. § 45) and similar state laws.

263.    Defendant's wrongful practices occurred in the course of trade or commerce.

264.    Defendant's wrongful practices were and are injurious to the public interest because those practices were part of a generalized course of conduct on the part of Defendant

that applied to all Class members and were repeated continuously before and after Defendant obtained Private Information from Plaintiff and Class members.

265.    All Class members have been adversely affected by Defendant conduct and the public was and is at risk as a result thereof.

266.    As a direct and proximate result of Defendant's conduct, Plaintiff and Class members have suffered harm, including, but not limited to: (i) invasion of privacy; (ii) theft of their Private Information; (iii) lost or diminished value of Private Information; (iv) lost time and opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (v) loss of benefit of the bargain; (vi) lost opportunity costs associated with attempting to mitigate the actual consequences of the Data Breach; (vii) experiencing an increase in spam calls, texts, and/or emails; (viii) statutory damages; (ix) nominal damages; and (x) the continued and certainly increased risk to their Private Information, which: (a) remains unencrypted and available for unauthorized third parties to access and abuse; and (b) remains backed up in Defendant's possession and is subject to further unauthorized disclosures so long as Defendant fails to undertake appropriate and adequate measures to protect the Private Information.

267.    Pursuant to 815 ILL. COMP. STAT. § 505/10a(a), Plaintiff seeks actual, compensatory, and punitive damages (pursuant to 815 ILL. COMP. STAT. § 505/10a(c)), injunctive relief, and court costs and attorneys' fees as a result of Defendant's violations of the Illinois CFA.

## **PRAYER FOR RELIEF**

WHEREFORE**,** Plaintiffs, on behalf of themselves and Class Members, request judgment against Defendant and that the Court grants the following:

A.    For an Order certifying this action as a class action and appointing Plaintiffs and their counsel to represent the Class and Illinois Subclass;

B.    For equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information, and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

C.    For injunctive relief requested by Plaintiffs, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiffs and Class Members, including but not limited to an order:

    i.    prohibiting Defendant from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Defendant to protect, including through encryption, all data collected through the course of its business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Defendant to delete, destroy, and purge the personal identifying information of Plaintiffs and Class Members unless Defendant can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiffs and Class Members;

    iv.    requiring Defendant to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality

and integrity of the Private Information of Plaintiffs and Class Members;

v.      prohibiting Defendant from maintaining the Private Information of Plaintiffs and Class Members on a cloud-based database;

vi.     requiring Defendant to engage independent third-party security auditors/penetration testers as well as internal security personnel to conduct testing, including simulated attacks, penetration tests, and audits on Defendant's systems on a periodic basis, and ordering Defendant to promptly correct any problems or issues detected by such third-party security auditors;

vii.     requiring Defendant to engage independent third-party security auditors and internal personnel to run automated security monitoring;

viii.   requiring Defendant to audit, test, and train its security personnel regarding any new or modified procedures; requiring Defendant to segment data by, among other things, creating firewalls and access controls so that if one area of Defendant's network is compromised, hackers cannot gain access to other portions of Defendant's systems;

ix.     requiring Defendant to conduct regular database scanning and securing checks;

x.      requiring Defendant to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling

personal identifying information, as well as protecting the personal identifying information of Plaintiffs and Class Members;

xi.    requiring Defendant to routinely and continually conduct internal training and education, and on an annual basis to inform internal security personnel how to identify and contain a breach when it occurs and what to do in response to a breach;

xii.    requiring Defendant to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Defendant's policies, programs, and systems for protecting personal identifying information;

xiii.    requiring Defendant to implement, maintain, regularly review, and revise as necessary a threat management program designed to appropriately monitor Defendant's information networks for threats, both internal and external, and assess whether monitoring tools are appropriately configured, tested, and updated;

xiv.    requiring Defendant to meaningfully educate all Class Members about the threats that they face as a result of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves;

xv.    requiring Defendant to implement logging and monitoring programs sufficient to track traffic to and from Defendant's servers; and

      xvi.    for a period of 10 years, appointing a qualified and independent third party assessor to conduct a SOC 2 Type 2 attestation on an annual basis to evaluate Defendant's compliance with the terms of the Court's final judgment, to provide such report to the Court and to counsel for the class, and to report any deficiencies with compliance of the Court's final judgment;

D.    For an award of actual damages, compensatory damages, statutory damages, and nominal damages, in an amount to be determined, as allowable by law;

E.    For an award of punitive damages, as allowable by law;

F.    For an award of attorneys' fees and costs, and any other expenses, including expert witness fees;

G.    Pre- and post-judgment interest on any amounts awarded; and

H.    Such other and further relief as this court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand a trial by jury on all triable issues.

Dated: February 15, 2024          Respectfully submitted,

                    */s/ Gary M. Klinger*
                    Gary M. Klinger
                    **MILBERG COLEMAN BRYSON PHILLIPS GROSSMANP LLC**
                    227 W. Monroe Street, Suite 2100
                    Chicago, IL 60606
                    Phone: (866) 252-0878
                    gklinger@milberg.com

                    *Counsel for Plaintiffs and the Proposed Class*